264 F.Supp.2d 852 (2002)
MONSANTO COMPANY, Plaintiff,
v.
BAYER BIOSCIENCE, N.V., Defendant.
No. 4:00CV01915ERW.
United States District Court, E.D. Missouri, Eastern Division.
December 27, 2002.
*853 Jeanine R. Bermel, Thomas J. DeGroot Joseph P. Conran, Husch and Eppenberger, LLC, St. Louis, MO, Michael E. Lee, John F. Lynch, Susan K. Knoll, Steven G. Spears, Howrey and Simon, Houston, TX, Daniel T. Shvodian, Howrey and Simon, Menlo Park, CA, for Monsanto Co.
H. Johnathan Redway, Eric H. Weisblatt, R. Danny Huntington, Regis E. Slutter, Ronni S. Jillions, Susan M. Dadio, Barbara Webb Walker, Timothy A. Molino, Burns and Doane, Alexandria, VA, Lisa A. Pake, Haar and Woods, LLP, St. Louis, MO, Timothy G. Barber, Bradley C. Morris, Womble and Carlyle, Charlotte, NC, for Bayer Bioscience N.V.
John Gianoulakis, Robert A. Useted, David A. Castleman, Maria Hahalis, Kohn and Shands, St. Louis, MO, for Wayne M. Barnes.

MEMORANDUM AND ORDER
WEBBER, District Judge.
Before the Court is Plaintiff Monsanto's Motion for Summary Judgment of Inequitable Conduct [doc. # 143]. For the following reasons, that motion is granted.

1. Procedural Background
Plaintiff Monsanto Company has sought a declaration that its Mon810 YieldGard® corn products do not infringe the claims of four United States patents owned by Defendant Bayer Bioscience [1]U.S. Patent Numbers 5,254,799 (the '799 patent); 5,545,565 (the '565 patent); 5,767,372 (the '372 patent); and 6,107,546 (the '546 patent). Bayer counterclaimed, arguing that Monsanto infringed claims 1-5 of the '799 patent; claims 1-8 and 12 of the '565 patent; claims 1-5, 13, and 18 of the '372 patent; and claims 1-7 of the '546 patent. This Court held a Markman hearing and construed the disputed patent claims.
Shortly after issuing the order construing certain terms of the asserted claims, this Court grantedin Monsanto's favor summary judgment of non-infringement of the '799 patent, the '565 patent, and claim 4 of the '372 patent, and summary judgment of invalidity of the '546 patent and claims 13 and 18 of the '372 patent. The only remaining claims for the Court's consideration, then, are claims 1-3 and 5 of the '372 patent. Monsanto now moves for summary judgment that these remaining claims are unenforceable due to Bayer's inequitable conduct in prosecuting their original patent application.[2]

II. Facts

A. Prosecution History of the '799 patent
This motion revolves around the prosecution history of what is now United *854 States Patent No. 5,254,799.[3] In the PTO's first substantive office action on the patent, they considered and rejected claims 240-323 of the original serial no. 06/821,582, as well as claims 387-390 that Bayer added as an amendment. All of the claims depended on claim 240, which claimed:
A plant which includes in its cells [sic] genome and expresses a chimeric gene comprising:
(a) a DNA fragment comprising a promoter region derived from a gene which is naturally expressed in a plant cell; and
(b) at least one DNA fragment coding for a polypeptide toxin produced by Bacillus thuringiensis or having substantial sequence homology thereto.
Prosecution History of '799 patent, JM-6, at 280[4]
The PTO rejected these claims, because, among other reasons, the inventor's disclosure was enabling only for claims limited in accordance with the teachings of the specification with regard to the Bt2 crystal protein polypeptide toxin of the berliner 1715 strain of Bt.[5] The examiner thought the inventors' broad claim of any polypeptide toxin produced by Bt was inappropriate.
Bayer then cancelled the rejected claims, and replaced them with claims 391-410.[6] The dominant one was claim 391, which read:
A plant cell, the genome of which contains a chimeric gene comprising:
(a) a first DNA fragment that encodes a Bacillus thuringiensis insecticidal crystal protein which has been truncated towards a trypsin cleavage site of the protein; and
(b) a promoter region and a 3' nontranslated region containing a polyadenylation signal; the first DNA fragment being under the control of the promoter region; the promoter and 3' non-translated regions allowing the first DNA fragment to be expressed in the ceil;
(c) whereby the chimeric gene can be expressed in the cell as an insecticidal Bacillus thuringiensis polypeptide toxin.
JM-6 at 406.
The Patent office still found several problems with the broad scope of the claim. Noting that the inventors has exemplified the successful use of only the Bt2 crystal protein toxin gene, and that the inventors gave insufficient guidance on how to extrapolate their methods to all Bt genes, the examiner rejected the claims, and insisted that Bayer limit them to the use of the Bt2 gene alone.[7] The PTO also renewed its objection that the inventors' disclosure was enabling only for the berliner 1715 strain of Bt.[8]
On July 23, 1990, the inventors filed a preliminary amendment cancelling claims 392, 393 and 397, and adding claims 411-431. Dominant claim 411 was the same as *855 claim 391, except that in subparagraph (a), it added the limitation that the first DNA fragment had to encode a polypeptide having a molecular weight of approximately 60-80 kD.[9]
The PTO again rejected all of the pending claims in April of 1991. As with all previous rejections, the PTO emphasized that the inventors had not enabled their claimed invention for all Bt crystal proteins.[10] The examiner noted in the rejection that not only were there different varieties of Bt that had numerous insecticidal proteins with varying homology to one another, but the same variety of Bt might have several insecticidal proteins.[11] He further found that the disclosure was "enabling only for claims limited in accordance with the teachings of the specification" with regard to the Bt2 berliner 1715 crystal protein gene where the insecticide encoding fragment is the insecticide coding fragment found in any of pnos Bt2, pssu-Tp-Bt2, pGS1110, pGS1151, and the plant or plant cell is tobacco, and the toxic activity is directed against Manduca sexta or P. brassicae.[12] The examiner even expressed his desire that the inventors specify the particular Bt crystal protein claimed.[13]
Around the time of the April 1991 PTO rejection, Dr. Marnix Peferoen ran Bayer's insect control group, with Mr. Stefan Jansens in charge of entomology, Dr. Marc Cornelissen in charge of Bacillus thuringiensis (Bt) expression, Dr. Arlette Reynaerts in charge of Bt plants, and Dr. Johan Cardoen in charge of Bt patents. This group met regularly to discuss the progress of the various parts of Bayer's Bt project. On June 11, 1991, Dr. Cardoen wrote a memo to the insect control group, and referred to the PTO's latest rejection of Bayer's patent claims. Dr. Cardoen wrote, in part:
We received Office Action from the U.S. PTO. It appears that we are back to square 1. The examiner urges us to limit our claims to the Bt2 gene and tobacco. An interview with the examiner will be necessary; in my opinion we could obtain fairly soon claims on plants containing Bt2-like genes; in order to obtain broader claims we will have to go in appeal (this will probably take 2 years). We will have to decide whether we should follow this strategy or whether we should try to obtain broader claims right away.
Plaintiff's Exhibit 39.
In response to the PTO's latest rejection, Stefan Jansens submitted a declaration [14] to the PTO under 37 C.F.R. § 1.132,[15] with Dr. Cardoen's assistance. His declaration included tables and figures of test results obtained from bioassays conducted during the course of his work at Bayer, on tomato, tobacco, and potato plants transformed to express truncated Bt proteins in lethal amounts. The declaration was designed to convince the PTO that Bayer's claims should not be limited to truncated Bt2 genes in tobacco plants. Describing his test results, Mr. Jansens stated:

*856 In order to demonstrate that generally any truncated Bacillus thuringiensis ("Bt") gene could be expressed in generally any plant to provide an insect controlling amount of its encoded Bt polypeptide toxin in the so-transformed plant as disclosed in this application, the following tests were carried out under my supervision ....
Plaintiff's Exhibit 1 at p. 2
On page 5, of his declaration, Mr. Jansens continued:
The test results shown in appended Figs. 1-11 demonstrate that any truncated Bt gene can generally be used to provide an insect controlling amount of the encoded Bt polypeptide toxin in generally any plant transformed with the truncated Bt gene
Id. at 5.
Finally, Mr. Jansens swore:

I know of no test results which are contrary to or inconsistent with the test results set forth above in Table 3 and in appended Figures 1-11 and Tables 1 and 2 or which would lead to different conclusions from those expressed above.

Id. at 6. (emphases added).
After Bayer submitted this declaration, three Bayer representativesincluding Dr. Cardoeninterviewed with Che S. Chereskin, a patent examiner, to discuss the pending application. Relying in part on the Jansens declaration, Aventis's written responses to the PTO's objections, and the examiner interview, the PTO allowed the claims that ultimately issued as the '799 patent.[16] Those claims are not limited to the Bt2 gene or tobacco plants, but encompass any plant species susceptible to transformation by Agrobacterium.

B. Mr. Jansens' test results
Mr. Jansens' declaration refers to positive test results for controlling insects using truncated Bt in tobacco, tomato, and potato, but Mr. Jansens also supervised tests on cabbage, cotton, corn, and occasionally potatoes and tomatoes, that produced negative results that he did not disclose to the PTO.

(1) Cabbage
Dr. Reynaerts wrote a memorandum for a Bt meeting on February 2, 1988, stating that 10 cabbage plants transformed with "PTHW6" were evaluated in an insect assay on the Pieris brassicae and no effects were observed.[17] Dr. Jansens conceded at his deposition that the memorandum indicated that there were no insecticidal effects.[18] An undated report that includes a heading, "Focus for '90" states in the "Status" heading for Bt plants that no control of the white cabbage moth was obtained for the cryI(a)b Bt gene.[19] Another status *857 memo with Dr. Jansens' initials on the top flatly declared that, "so far, B.t. cabbages were unsuccessful in the control of Lepidoptera."[20] Finally, a memorandum dated April 30, 1991, addressed to Dr. Jansens, among others, contained overheads discussing the insect control project, and concluded that Bt expression levels were insufficient to obtain insect control in the plant genus Brassica.[21]

(2) Cotton
A report Dr. Peferoen authored on December 19, 1989, and addressed to the insect control group, reflected that bioassays indicated that the group had been unsuccessful in obtaining cotton bollworm control with engineered cotton.[22] The same report observed that there was "no CryIc detected in embryogenic callus...."[23] A February 2, 1990 report on the results of plant bioassays stated that 17 cotton plants transformed with bt 15 were tested and the results were negative.[24] Three months later, Dr. Peferoen wrote another report disclosing that "[a] total of 13 cotton plants were tested on Spodoptera and Heliothis, with negative results."[25] On October 8 of that year, Dr. Jansens reported that 17 CryI(a)b:neo cotton plants were assayed against Hv., and all were negative.[26] The April 1991 memorandum discussing negative results for cabbage also stated that Bt expression levels were insufficient to obtain insect control in cotton.[27]

(3) Other negative results and indications
The same October 1990 report indicated that CryIII and CryIB potato plants and CryIC tomato plants were assayed and all produced negative results.[28] Dr. Reynaerts also concluded, in a May 1991 report, that expression levels were insufficient to obtain insect control in potato plants with CryIB, CryIIA, and CryIIIB genes.[29] Dr. Peferoen, the chair of the insect control group at the relevant time, admitted in his deposition that Bayer had no success in obtaining insect control in brassica and cotton using certain Bt2 promoters, and that some Bt2 genes did not work for certain tobacco and potato pests.[30] Finally, on September 9, 1991, the same day Mr. Jansens signed his declaration, he obtained the results of his first bioassay on corn which were negative.[31] The record is not clear if he received the negative results on corn before he signed the declaration, but it is clear that Jansens did not disclose this information to the PTO.[32]

*858 III. Discussion

A. Summary judgment standard
Summary judgment is appropriate only if all of the information before the court shows there is no genuine issue of material fact and the moving party is entitled to "judgment as a matter of law." Fed. R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those that might affect the outcome of the suit under the governing law. Id. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, ... there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548.
The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). The burden then shifts to the nonmoving party who must set forth specific evidence showing that there is a genuine dispute as to material issues. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. Id. The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. Id.

B. The law of inequitable conduct
Patent applicants and their representatives have a duty of candor, good faith, and honesty toward the United States Patent and Trademark Office (PTO) in prosecuting patent applications. Life Techs, v. Clontech Labs., 224 F.3d 1320, 1324 (Fed.Cir.2000). A breach of this duty is considered inequitable conduct, and this Court may rule patents tainted by that inequitable conduct unenforceable, even though the patents may be valid and even infringed. See Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995). Inequitable conduct is typically one of three forms: (1) affirmative misrepresentations of a material fact; (2) failure to disclose material information; or (3) submission of false material information. Baxter Int'l v. McGaw, Inc., 149 F.3d 1321, 1327 (Fed.Cir.1998).
The Court uses a 3-step process to determine if Bayer's conduct was inequitable. First, the Court asks whether Monsanto has made a threshold showing that Bayer's false declaration was material. Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1261 (Fed.Cir.2001). Information is material if there is a substantial likelihood that a reasonable patent examiner would consider it important in deciding whether to allow the application to issue as a patent. Li Second Family Ltd, Partnership v. Toshiba Corp., 231 F.3d 1373, 1380 (Fed.Cir.2000).[33] Second, *859 the Court must decide if the false declaration was carried out with intent to deceive the PTO. Monon Corp., 239 F.3d at 1261. Monsanto must establish both materiality and intent to deceive by clear and convincing evidence. Abbott Labs. v. Torpharm, Inc., 300 F.3d 1367, 1380 (Fed.Cir.2002). Finally, if Monsanto establishes materiality and intent, the Court must weigh its factual findings on these issues to make an equitable determination whether to deny enforcement of the patents-in-suit. Monon Corp., 239 F.3d at 1261.

C. Did Bayer engage in inequitable conduct?
First, the Court notes that the Federal Circuit has instructed district courts to use caution in granting summary judgment that inequitable conduct has occurred. For example, that court has said that summary judgment that a reputable attorney was guilty of inequitable conduct, over his denials, should be rare. Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed.Cir.1988); see also Kanga-ROOS USA Inc. v. Caldor, Inc., 778 F.2d 1571, 1577 (Fed.Cir.1985) (noting that proving inequitable conduct at the summary judgment stage should be rare because the defense requires an examination of all the facts and circumstances of each case). The moving party must prove materiality and intent to deceive the PTO by clear and convincing evidence at this stage, just as they would with a trial on the merits. Baker Oil Tools, Inc. v. Geo Vann, Inc., 828 F.2d 1558, 1566 (Fed.Cir. 1987).
The Federal Circuit, has, however, affirmed a summary judgment grant of inequitable conduct, recognizing that it may be appropriate. See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed.Cir.1993). In Paragon Podiatry, the court noted that the ultimate question was whether materiality and intent to deceive the PTO were reasonably disputed. Id. The ultimate question for this Court is to decide if the facts surrounding materiality and intent makes the determination inferable either way, or if the evidence is so one-sided that the Court may judge materiality and intent as a matter of law. Id. The Court must examine Bayer's good faith, but "merely conclusory statements, or completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a genuine issue of fact." Id.

(1) Materiality
The relevant portions of Mr. Jansens' declaration to the PTO are worth repeating here:
Mr. Jansens stated:
In order to demonstrate that generally any truncated Bacillus thuringiensis ("Bt") gene could be expressed in generally any plant to provide an insect controlling amount of its encoded Bt polypeptide toxin in the so-transformed plant as disclosed in this application, the following tests were carried out under my supervision ....
Plaintiff's Exhibit 1 at p. 2
On page 5, of his declaration, Mr. Jansens continued:
The test results shown in appended Figs. 1-11 demonstrate that any truncated *860 Bt gene can generally be used to provide an insect controlling amount of the encoded Bt polypeptide toxin in generally any plant transformed with the truncated Bt gene
Id. at 5.
Finally, Mr. Jansens swore:

I know of no test results which are contrary to or inconsistent with the test results set forth above in Table 3 and in appended Figures 1-11 and Tables 1 and 2 or which would lead to different conclusions from those expressed above.

Id. at 6. (emphases added).
Bayer vigorously contends that in spite of all the negative results Bayer experienced with insect control in cotton and cabbage, these results were not contrary to anything Mr. Jansens said in his PTO declaration. They argue that they did not perform enough tests with cabbage and cotton to make a general scientific conclusion about insect control in those plants, and that the tests they did perform were unreliable. Thus, according to Bayer, Jansens' declaration was not false. This argument, however, is unpersuasive. Jansens mentioned the positive results for tobacco and tomato plants, and said he didn't know of any contrary or inconsistent test results. Monsanto has, however, presented overwhelming evidence of negative results for other plant species that Jansens did not mention. While the negative test results he knew about may not have been enough to form a general scientific conclusion on those particular plants, they were still contrary to the positive test results Bayer experienced with other species. Furthermore, negative results on cabbage and cotton, would militatehowever slightlyagainst a finding that any truncated Bt gene can generally be used to provide an insect controlling amount of the encoded Bt polypeptide toxin in generally any plant transformed with the truncated Bt gene. Mr. Jansens swore, under penalty of perjury, that he knew of no test results pointing towards the opposite direction of his opinion. The Court, therefore, finds that at least with respect to cotton and cabbage, his declaration was false.[34]
Although the Federal Circuit has generally refused to declare any type of conduct material per se, see Seiko Epson Corp. v. Nu-Kote Int'l Inc., 190 F.3d 1360, 1367 (Fed.Cir.1999), the court has found that affidavits are inherently material, and that the submission of an affidavit implies that it will be relied on. Refac Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1583 (Fed. Cir.1996); see also Herman v. William Brooks Shore Co., 111 F.3d 142, 1997 WL 130313 (Fed.Cir.1997) (unpublished decision refusing to disturb the district court's finding that a false Rule 131 affidavit was inherently material); Rohm & Haas Co. v. Crystal Chem. Co., 722 F.2d 1556, 1571 (Fed.Cir.1983) (stating that in contrast to cases where allegations of inequitable conduct are based on the withholding of prior art, there is no room to argue that submission of false affidavits is not material). Indeed, although Bayer argues that the data in the Jansens declaration is not material because Monsanto has not proven that a nexus exists between the data Jansens left out and the pending patent claims, it defies logic and reason to believe that a reasonable examiner would not find this information importantespecially when one considers that Jansens himself acknowledged in his deposition that he *861 submitted his declaration to the PTO for the purpose of persuading the Office that Bayer's pending patent claims should not be limited to tobacco or to the Bt2 gene.[35] Furthermore, a Bayer "Bt meeting" memorandum circulated on November 14, 1991, confirms that the data Jansens compiled "appeared to be very helpful for the interview." [36] The only reasonable conclusion the Court may drawin light of the PTO's persistent belief before the Jansens declaration that the pending patent claims were not enabling for anything but the Bt2 gene and tobaccois that the negative results Monsanto has brought to light would be highly important to a reasonable examiner. It simply should have been included in the equation. The Court finds by clear and convincing evidence that the Jansens declaration is highly material.

(2) Intent to deceive the PTO
The Federal Circuit has recognized that direct evidence of the intent element of the inequitable conduct defense is rarely available, and is mainly proved by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred. Akron Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380, 1384 (Fed.Cir. 1998). The intent necessary to establish inequitable conduct is based on a sliding scale related to the materiality of Bayer's false declaration. Abbott Labs. v. Torpharm, Inc., 300 F.3d 1367, 1379 (Fed.Cir. 2002). Thus, the more material the conduct is, the less evidence of intent is needed to prove the defense.
Bayer is correct that a district court may not use materiality alone to infer intent. See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1191 (Fed.Cir.1993) (emphasis added). One does not, however, submit a false affidavit unless he intends the PTO to rely on what he has declared. The inference of intent to deceive the PTO in this situation arises from Bayer's affirmative act of submitting a false affidavit, its misleading character, and the inability of the patent examiner to investigate the facts. See Paragon Podiatry Lab., Inc., 984 F.2d at 1191. It is true that the patent examiner in this case had a Ph.D. in biochemistry and had experience with gene cloning, but she could only consider insect bioassays Bayer made known to her.
Even considering Bayer's good faith argument that Jansens didn't include the results on cotton and cabbage because he couldn't form a general scientific conclusion about them, the evidence surrounding the false affidavit very convincing that Bayer intended to deceive the PTO. Up until the Jansens declaration, the PTO had insisted that Bayer limit its claims in what ultimately became the '799 patent to the Bt2 gene and to tobacco plants. The PTO wanted to limit Bayer in this manner because it found that Bayer's disclosure was not enabling for broader claims. Bayer, quite simply, could not accept that. Bayer filed response upon response refusing to limit their claims, and it was only after the Jansens declaration that the PTO relented. Furthermore, Bayer acknowledges that its predecessor corporation was a small enterprise with limited resources, that it was pursuing a survival strategy, and that it was facing a lengthy appeal to attempt to gain broad requested claims in a highly competitive business environment with rapidly evolving scientific discoveries.
The evidence clearly and convincingly supports the inference that Jansens left negative results on cabbage and cotton out of his declaration because he was afraid *862 the PTO would stick to its original assessment of Bayer's pending claims.

(3) Equitable determination
The Court is troubled by the overwhelming evidence of Bayer's deception in this case. Filing a false affidavit is different from most of the inequitable conduct cases, which typically involve a scientist failing to disclose a piece of prior art. Bayer submitted this declaration because it wanted to convince the PTO to finally issue them broader claims. The company made great efforts over many years to obtain broader claims, and many of the tests results they obtained did not comport with the company's desires. Nevertheless, Bayer chose to provide the positive results to the PTO, but left out the negative tests.
A party prosecuting a patent wrongfully acquires a benefit when it deceives the Patent Office by making representations that are knowingly false or misleading. Granting valuable patent rights protects the innovations of those willing to submit claims from others who would otherwise unjustifiably benefit from their efforts. For these reasons, the courts have insisted upon honesty from those advancing patent claims. Valuable protections are awarded to successful applicants, but no protection should be granted to anyone who intentionally files a false affidavit that would likely influence a reasonable examiner.
Therefore, the Court finds by clear and convincing evidence that all of the patent claims in this case are unenforceable because they are direct descendants of the '799 patent.[37] Although only claims 1-3 and 5 of the '372 patent are remaining in this case, this holding applies to all of the patents-in-suit.

IV. Conclusion
The Court finds that Monsanto has proved clearly and convincingly that Bayer has engaged in inequitable conduct.
Therefore,
IT IS HEREBY ORDERED that Plaintiff Monsanto's Motion for Summary Judgment of Inequitable Conduct [doc. # 143] is GRANTED.
IT IS FURTHER ORDERED that all other pending motions in this case are DENIED AS MOOT.
NOTES
[1] On June 11, 2002, Aventis Cropscience N.V. was renamed Bayer Cropscience N.V., which the shareholders subsequently changed to Bayer Bioscience, N.V. on July 9. This Court granted Defendant's motion to change the name in the Court documents on December 19, 2002. The Court will refer to the Defendant as Bayer throughout this order even though the Defendant was known by other names during the time periods discussed here.
[2] Monsanto's motion, filed on November 18, 2002, argues that all of the patents-in-suit are unenforceable; the Court only treats claims 1-3 and 5 of the '372 patent because those are the only remaining claims.
[3] The patent actually issued from Application Serial No. 07/555,828, filed July 23, 1990, which was a continuation of Application Serial No. 06/821,582, filed January 22, 1986, which was a continuation-in-part of Application Serial No. 06/692,759, filed January 18, 1985.
[4] JM signifies Joint Markman, and JM-6 is volume 6 of the stipulated exhibits the parties submitted for the Markman hearing.
[5] JM-6 at 393.
[6] JM-6 at 406.
[7] JM-6 at 430.
[8] JM-6 at 429.
[9] JM-6 at 449.
[10] JM-6 at 499, lines 14-22.
[11] Id.
[12] JM-6 at 501, lines 9-16.
[13] JM-6 at 499, lines 21-22.
[14] The inventors also submitted amendments under 37 C.F.R. §§ 1.111 and 1.115.
[15] The provision reads:

When any claim of an application or a patent under reexamination is rejected or objected to, any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for must be by way of an oath or declaration under this section
37 C.F.R. § 1.132 (2001).
[16] Claim 1, upon which all of the other claims formerly asserted depended, recited: A plant cell susceptible to transformation by Agrobacterium, the genome of which contains a chimeric gene comprising:

(a) a first DNA fragment that encodes a N-terminal fragment of approximately 60-80 kD, derived from DNA encoding a Bacillus thuringiensis insecticidal crystal protein of approximately 130 kD which has been truncated; and
(b) a promoter region and a 3' non-translated region containing a polyadenylation signal; the first DNA fragment being under the control of the promoter region; the promoter and 3' non-translated regions allowing the first DNA fragment to be expressed in the cell; whereby the chimeric gene can be expressed in the cell as an insect controlling amount of an insecticidal Bacillus thuringiensis polypeptide toxin with toxicity to Lepidoptera insects.
'799 patent, JM-2 at col. 60, lines 20-36.
[17] Plaintiff's Exhibit 19.
[18] Plaintiff's Exhibit 10, at 22 (page 83 of original deposition).
[19] Plaintiff's Exhibit 20, at P 0103290.
[20] Plaintiff's Exhibit 21, at 2 (P 0064821).
[21] Plaintiff's Exhibit 18, at P 0103344.
[22] Plaintiff's Exhibit 22 at P0114249.
[23] Id.
[24] Plaintiff's Exhibit 23, at P 0103571.
[25] Plaintiff's Exhibit 24, at P0099841.
[26] Plaintiff's Exhibit 25.
[27] Plaintiff's Exhibit 18, at P 0103344.
[28] Plaintiff's Exhibit 25.
[29] Plaintiff's Exhibit 18 at P 0103345.
[30] Plaintiff's Exhibit 9 at 42 (original deposition pages 162-163).
[31] Plaintiff's Exhibit 26 at P0070615.
[32] Monsanto has also pointed to negative results on corn that Mr. Jansens received after the date of his declaration. The Court however, has not considered those results for the purposes of deciding this motion, because Monsanto's inequitable conduct defense focuses on Mr. Jansens making a false statement to the PTO. Since Mr. Jansens did not know about the remaining corn results until after the date of his declaration date, Monsanto can not properly use them to prove Mr. Jansens testified falsely. The Court notes, however, that after receiving the negative results, Bayer never reported the information to the PTO. Although there is enough evidence of inequitable conduct notwithstanding the negative results on corn, the Court notes that in another interview with the examiner in October of 1991one month after Jansens' declarationneither Cardoen nor Jansens apprised the examiner of their negative results with corn.
[33] The United States Patent and Trademark Office established the "reasonable examiner standard" as its test for materiality when it adopted its own administrative rule of candor and good faith in 1977. See 37 C.F.R. § 1.56 (1991). The Federal Circuit has adopted this reasonable examiner standard as the test for whether information is material for purposes of analyzing an inequitable conduct defense in a patent infringement lawsuit. In 1992, the PTO changed their materiality test to a more stringent standard based on patentability, see 57 Fed.Reg.2021 (Jan. 17, 1992), but the Federal Circuit has not followed suit. See Li Second Family Ltd. Partnership v. Toshiba Corp., 231 F.3d 1373, 1380 (Fed.Cir.2000) (noting that the materiality test for inequitable conduct is whether a reasonable examiner would consider the information important, not whether the information would conclusively decide the issue of patentability).
[34] Bayer argues that Jansens included in his declaration the test results on tomato using the CryIC gene, and that Monsanto's evidence on potato refers to ELISA assays, and not the insect bioassays Jansens conducted. For purposes of this motion, the Court draws all reasonable inferences in favor of Bayer. Even disregarding these tests, there nonetheless sufficient evidence in the record to demonstrate that Jansens' affidavit was false.
[35] See Plaintiff's Exhibit 10 at 44 (original deposition page 173).
[36] Plaintiff's Exhibit 16.
[37] See Exhibit 33 for a diagram of the patent lineage. Bayer does not dispute the notion that all the patents-in-suit have the same disclosure and are all linked together. Nor do they dispute that if the '799 claims would be unenforceable due to inequitable conduct, every other claim in this case would be unenforceable as well.