**IPXL HOLDINGS, L.L.C., Plaintiff,**

v.

**AMAZON.COM, INC., Defendant.**

No. CIV.A.04–70.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 25, 2004.

514

Keith R. Styles, Robins, Kaplan, Miller & Ciresi, LLP, Washington, DC, Michael V. Ciresi, Jan M. Conlin, Richard Martinez, Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, for plaintiff.

John F. Scalia, David A. Kessler, Greenberg Traurig LLP, McLean, VA, David K. Callahan, Thomas G. Pasternak, Cindy S. Ahn, David Rokach, Kirkland & Ellis, LLP, Chicago, IL, David Olson, Christine E. Duh, Kirkland & Ellis, LLP, San Francisco, CA, for defendant.

*MEMORANDUM OPINION*

BRINKEMA, District Judge.

Plaintiff filed this case on January 22, 2004, alleging that the defendant's "1–Click" feature infringes plaintiff's United States Patent No. 6,149,055 ("the '055 patent"). On March 25, 2004, after unsuccessfully seeking a transfer of venue pursuant to 28 U.S.C. § 1404, the defendant answered plaintiff's complaint, asserting affirmative defenses and declaratory judgment counterclaims for non-infringement and invalidity.

Pursuant to the March 24, 2004, Scheduling Order, the parties completed their briefing on claim construction by June 28, 2004. On June 23, 2004, the defendant moved for summary judgment that the '055 patent is non-infringed and invalid, and the plaintiff moved for summary judgment that the '055 patent is non-obvious. These claim construction and summary judgment issues have been extensively briefed. On July 16, 2004, the Court heard oral argument on the parties' respective claim construction and summary judgment positions.

This Memorandum Opinion resolves all claim construction issues. In light of the claim constructions, the Court will grant defendant's summary judgment motions regarding noninfringement and invalidity and deny plaintiff's summary judgment motion. These rulings render moot the defendant's claims of inequitable conduct, which will be denied. With these rulings, all issues will have been resolved, and the trial of this civil action will be unnecessary.

**Background**

The '055 patent is generally directed to an electronic fund transfer or electronic fund transaction system, such as an automated teller machine ("ATM") system, which stores, predicts, and presents information to the user in a convenient and efficient manner. The owner of the '055 patent, IPXL Holdings, LLC ("IPXL") is a Virginia limited liability company with its principal place of business in Arlington, Virginia. IPXL is a single member LLC, of which Mr. James Gatto, an attorney currently practicing law in Virginia, is the only member. Mr. Gatto is also the sole inventor of the subject matter of the '055 patent and the patent attorney who prosecuted the '055 patent.

Amazon is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon operates a website at *www.amazon.com* and is a well-known retailer of goods over the Internet. As part of Amazon's business, Amazon offers a "1–Click" ordering feature, which allows on-line consumers who have previously stored information, such as credit card numbers, shipping addresses, etc., to place an order quickly, without having to reenter the stored information. Amazon's 1–Click feature gained notoriety throughout the e-commerce community when Amazon successfully enforced its 1–Click patent, United States Patent No. 5,960,411, against rival retailer Barnes and Noble. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed.Cir.2001). It is Amazon's 1–Click ordering feature that is

accused of infringing IPXL's '055 patent in this case.

Before the Court are matters of both claim construction and summary judgment of noninfringement and invalidity. The Court first addresses the construction of the claims, as a proper claim construction stands as a prerequisite to both an infringement analysis and an invalidity analysis based upon a theory of anticipation.

**Legal Principles of Claim Construction**

Although not all of the complex procedural and substantive nuances involved in a district court's construction of claims are completely settled, *see e.g., Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed.Cir.2004)(order granting petition for rehearing *en banc* and inviting further briefing on issues concerning claim construction procedure generally), the Federal Circuit has provided a framework, and express guidance, for the construction of claims.

■ Under the Federal Circuit's framework, to ascertain the meaning of a patent's claims, the Court must turn first to the intrinsic evidence within the patent, including the claims themselves, the written description, and the prosecution history. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002)("Claim interpretation begins with the claims themselves, the written description, and, if in evidence, the prosecution history."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). When evaluating the intrinsic evidence, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of invention." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed.Cir.2003). In fact, the Court applies a heavy presumption that a claim term carries its ordinary and customary meaning as it would be understood by one of ordinary skill in the relevant art at the

time of the invention. *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed.Cir. 1999).

Although reference to the language of the claims and the written description is paramount, *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir. 1998), the prosecution history also provides a particularly helpful reference, as it "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics* 90 F.3d at 1582–83.

■ Only where the Court remains unable to ascertain meaning from such intrinsic evidence should the Court then turn to extrinsic evidence, such as expert testimony. *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1269 (Fed.Cir.2001). In most situations, resort to extrinsic evidence is unnecessary and improper, as "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics* 90 F.3d at 1582.

■ Several of the terms found in the claims of the '055 patent are expressly defined in the written description, and other terms, although not expressly defined, are illustrated through examples in the written description. Such definitions and examples have been helpful, however, the Court is aware that it must exercise particular care when interpreting claims in light of the specification, as "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.Cir.1998). Although it is improper to read a limitation from the specification into the claims, *Comark Communications* at 1186 (Fed.Cir.

1998), "[c]laims must be read in view of the specification, of which they are a part," *Markman*, 52 F.3d at 979, *see also United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)("[C]laims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention.")

## Asserted Claims

Plaintiff alleges that the defendant's 1–Click feature infringes claims 1, 2, 9, 15 and 25 of the '055 patent. Claim 1 is the only independent claim of the '055 patent. The language of the asserted claims is set forth below, with the disputed claim elements emphasized.

### Claim 1

An electronic *financial transaction* system for *executing* financial transactions, the *transactions* being characterized by a *transaction type* and a plurality of *transaction parameters,* the system comprising:

a central controller;

a *communications network;*

a terminal device selectively connectable to the central controller through the *communications network,* the terminal device comprising:

a processor;

a display connected to the processor;

an input mechanism for providing input to the processor;

the system further comprising *means for storing user defined transaction information,* the *transaction information* comprising at least one of user defined *transactions* and user defined *transaction parameters;*

the processor causing the display to display on a *single screen* stored *transaction information;* the input mechanism enabling a user to use the displayed transaction information to *execute* a *financial transaction* or to enter selections to specify one or more *transaction parameters.*

### Claim 2

The system of claim 1 wherein the system predicts the transaction information that a user of the terminal will desire based on stored data for that user.

### Claim 9

The system of claim 1 further comprising means for identifying a user prior to enabling the user to execute a transaction.

### Claim 15

The system of claim 9 wherein the system predicts transaction information that a user of the terminal will desire based on stored data for that user.

### Claim 25

The system of claim 2 wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and the user uses the input means to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

■ Although the Court "may not invalidate the claims of a patent without construing the disputed limitations of the claims and applying them to the allegedly invalidating acts," *Dana Corp. v. American Axle & Manufacturing, Inc.*, 279 F.3d 1372, 1376 (Fed.Cir.2002), the Court is not "obliged to construe undisputed claim terms" before performing an invalidity analysis in the context of summary judgment. *Unitherm Food Systems, Inc. v. Swift–Eckrich, Inc.*, 375 F.3d 1341 (Fed. Cir.2004) *citing U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1567 (Fed. Cir.1997); *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1357. As such, the Court's claim construction

analysis will focus exclusively on the disputed claim elements indicated above, assigning the plain and ordinary meaning to all undisputed elements.

**Claim Construction: "Financial Transaction"**

■ A clear definition of "financial transaction" as used in the preamble is necessary to a determination of the meaning of many of claim 1's elements. The first reference to "financial transaction" in claim 1 appears in the claim's preamble, and many of claim 1's elements contain additional references to "transactions," including "transaction type," "transaction parameters" and "transaction information."

In their claim construction briefs, both parties agree that in this case, the preamble of claim 1 provides a limitation pursuant to Federal Circuit case law. *See e.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed.Cir. 1989); *Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 872 (Fed.Cir.1998). The parties vigorously dispute, however, the meaning of the critical phrase "financial transaction," contained in the preamble to claim 1. Amazon generally contends that the phrase limits the claim to cover only transactions performed using electronic fund transfer systems, whereas IPXL generally contends that the phrase allows the claim to cover a much broader array of transactions. For the reasons set forth below, the Court finds Amazon's more narrow construction to be correct.

The language of the claim's preamble itself assigns two characteristics to "transactions":

> the transactions being characterized by a transaction type and a plurality of transaction parameters.

As such, each reference in claim 1 to "transaction" invokes both a "transaction type" and a "plurality of transaction parameters." An understanding that a claim 1's "transaction" is composed of a "transaction type" and a "plurality of transaction parameters," while helpful when interpreting the limitations of claim 1, only affords a circular and incomplete understanding of "financial transaction."

Reference to the additional intrinsic evidence, namely the specification and the prosecution history, is required to further define claim 1's "financial transaction" limitation.

The '055 specification dictates that:

> Except as otherwise used in connection with a specific activity, the term "transaction" is intended to broadly describe a wide variety of activities that are or may be performed using an EFT system. By way of example, but without limitation, this includes withdrawing cash, travelers' checks, bonds, and other negotiable instruments or other articles, depositing cash, checks, other negotiable instruments or other articles, transferring funds from one account to another, paying bills, credit card balances; or loan payments, cashing checks or other negotiable instruments, obtaining account balance information, paying for the purchase of goods or services, operating gaming devices (e.g., casino games, lottery games) and performing a wide variety of other activities.

Col. 5, ll. 36–49.

Although this passage sets forth broad and sweeping language when defining "transaction," it is clear from the patentee's express definition that a "transaction" must be limited to "activities that are or may be performed using an EFT system." In this case, "the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in . . .

the specification...." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002). Because the patentee, in the specification, has expressly incorporated "activities that are or may be performed using an EFT system" into the definition of "transaction," it is that definition that controls. *Renishaw, PLC v. Marposs S.p.A.*, 158 F.3d 1243, 1249 (Fed. Cir.1998).

Consistent with the patentee's express incorporation of "EFT systems" into the definition of "financial transaction," the patent specification generally speaks of the invention as relating to EFT systems:

- "ELECTRONIC FUND TRANSFER OR TRANSACTION SYSTEM." Invention Title.

- "An electronic fund transfer (EFT) system" .... Abstract (first words).

- "... electronic fund transfer systems such as automated teller machines." Col. 1, ll. 12–13.

Moreover, the patentee has also given express guidance as to the meaning of "EFT system." In addition to the examples set forth at Col. 5, ll. 36–49, all of which the patentee claims "are or may be performed using an EFT system," the specification provides further guidance concerning the nature of an EFT system:

Electronic fund transfer (EFT) systems in general are well known. One example of an EFT system is an automated teller machine (ATM).

Col. 1, ll. 22–24.

EFT systems also include point-of-sale terminals and a number of other systems. Point–of–Sale (POS) or point of interaction terminals (collectively referred to herein as "POS terminals") are used for example at grocery checkouts, gas station pumps and other retail locations to enable a user to pay for a purchase by using an ATM card, a credit card, a debit card or other similar methods. POS terminals also typically require a number of user inputs and transaction parameters to effect a transaction.

Col. 2, ll. 29–37.

Unsurprisingly, at least one unifying characteristic is found in every example of an EFT system set forth in the patent: each system directly and promptly allows the user to transfer or inquire about funds. This characteristic of allowing for direct and prompt transfer of or inquiry about funds is consistent with the plain meaning of "EFT system" and with the dictionary definitions offered to support that plain meaning.[1]

---

1. The Court's understanding of the plain meaning of "EFT system" is supported and confirmed by the following dictionary definitions in accordance with *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir.2002):

Electronic Funds Transfer: Electronic funds transfer (EFT) utilizes computer and electronic components in order to transfer money or other financial assets. *The New Palgrave Dictionary of Money & Finance* (1992) at 745.

· Electronic Fund Transfer System (EFTs): A variety of systems and technologies for transferring funds electronically rather than by check. *The Language of Banking* (1994) at 55.

Electronic Fund Transfer (EFT): Systems of transferring funds from one account to another by electronic impulses rather than transfer of paper. *Dictionary of International Finance* (Second Edition, 1985) at 75–76.

These definitions are taken from specialized finance and banking dictionaries. As such, the risk of arriving at an "absurd result" from "[i]ndiscriminate reliance on definitions found in dictionaries" remains minimal. *Liebscher v. Boothroyd*, 258 F.2d 948, 951 (CCPA 1958). The '055 invention is generally directed to financial transaction systems and discloses a common banking and transaction system, an ATM system, as its preferred embodiment. Indeed, definitions taken from fi-

The Court finds further support for its interpretation of "transaction" from the prosecution history, which includes several statements by the patentee limiting his invention to only those transactions involving ATM machines. For example, in response to a January 6, 1999, office action rejecting the application's claims under 35 U.S.C. § 103 in view of prior art references Madan and Martino, the applicant argued that

> Madan is not directed to an ATM machine as recited in claim 1.... Neither Madan nor Martino discloses an ATM that enables a user to select from a single screen transaction type and transaction parameters .... Madan is not an ATM machine and does not address the same problems as those addressed by the present invention.

Such comments might suggest that the applicant intended the "transactions" related to his invention to include only ATM machine transactions in particular, rather than EFT systems in general. Despite these comments, the Court is not inclined to prescribe such a narrow construction of "financial transaction" so as to limit the claim to covering only transactions involving ATM machines. The Court does, however, note the apparent inconsistency between the positions taken by the applicant during his prosecution of the patent and the carefully hedged language of the '055 specification, which indicates that ATM systems stand as only the preferred embodiment and that other EFT systems may also be covered.

In light of the express definitions chosen by the patentee, the prosecution history of the patent in suit, and the plain meaning of the term EFT, the Court construes the term "financial transaction" as follows:

> The electronic transfer of funds, or the electronic inquiry as to funds, using an electronic funds transfer ("EFT") system such as an ATM system or a point of sale ("POS") system. Such electronic transfer of funds, or electronic inquiry as to funds, being characterized by both a transaction type and a plurality of transaction parameters.

## Claim Construction: "Execute"

■ The "execute" language appears twice in claim 1. First in the preamble, "[a]n electronic financial transaction system for executing financial transactions," and also in a specific claim element, "the input mechanism enabling a user to use the displayed transaction information to execute a financial transaction or to enter selections to specify one or more transaction parameters."

Amazon contends that the term "execute" means to put completely into effect or to carry out fully. Under Amazon's definition, a system executing a financial transaction must be able to carry out a fund transfer or balance inquiry completely. IPXL does not provide an express rebuttal to Amazon's proposed construction. IPXL only responds that "executing" should not be limited to a financial institution or a financial services company interacting with a financial institution to carry out a transaction completely. For the reasons set forth below, the Court finds that Amazon's proposed construction is consistent with the plain meaning of the term and is the appropriate construction in this case.

The written description uses the word "execute," or a variant of "execute," on many occasions. Several examples demonstrate the context within which the terms are used:

nance and banking dictionaries are particu- larly well-suited to analysis of the '055.

Once all of the transaction parameters have been entered, the transaction is executed, in a known manner.

Col. 2, ll. 1–3.

It is another object of the invention to enable user-defined transactions to be completed with a reduced number of inputs from the user at the time the transaction is executed.

Col. 2, ll. 56–58.

Typically, the execution of a transaction requires providing user identification information to the system, providing verification information to verify the user is an authorized user, selecting a type of transaction or function, and selecting one or more transaction parameter (e.g., accounts, dollar amounts, etc.) and causing the transaction to be executed.

Col. 5, ll. 49–55.

Upon the user's selection of a desired menu choice, the associated transaction is then executed without the need for further inputs or selections by the user or with limited additional inputs or selections, thereby minimizing the number of selections, inputs or entries required by a user to execute a desired transaction.

Col. 7, ll. 12–17. Although the written description does not provide an explicit definition for "execute," it does set forth the context of how "execute" should be understood in connection with this invention.

According to a standard English dictionary, "execute" means: "to carry out fully; put completely into effect." *Merriam–Webster's Collegiate Dictionary* (Tenth Edition, 1996) at 405. Using a financial dictionary, the Court finds that "execution" means: "the completion of a transaction." *The Handbook of Financial Terms* (1997) at 200. These particular dictionary definitions are appropriate given the context of the relevant claim term and the invention in general. Again, reference to dictionary definitions to assist in construing the claim terms at issue is consistent with the Federal Circuit's guidance in *Texas Digital Systems*. Based on this analysis, the Court construes the terms "execute a financial transaction" and "executing a financial transaction" as meaning:

To fully carry out a financial transaction.

## Claim Construction: "Communications Network"

■ The primary dispute between the parties concerning the meaning of "communications network" in claim 1 centers on whether, as argued by IPXL, the term is broad enough to encompass packet switched networks, such as the Internet, or whether it encompasses only a single defined or dedicated path that is maintained for the duration of the transmission (such as a circuit switched network), which is Amazon's position. The Court concludes that IPXL's interpretation is correct because a person of ordinary skill in the art at the time of this invention would understand the plain meaning of the term "communications network" to encompass communications techniques of both the packet switched and circuit switched varieties.

Claim 1 requires a "communications network" and "terminal device selectively connectable to the central controller through the communications network." Although the written description does not expressly use the term "communications network," it does generally address the communication function of the system in the context of a "transaction network system." For instance, the specification explains that

The transaction network system preferably comprises one or more central control units or host processors 200, having associated database(s) or memories 300

and a plurality of transaction terminals 10 connected to one or more of the central control units 200 via communications link 400 in a known manner. An example of one known system and communications link is described in the '336 Patent. Other configurations may be used.

Col. 5, ll. 57–65.

FIG. 2 is a flow chart illustrating the operation of preferred embodiments of the present invention..... for simplicity, the well known steps associated with the local controller communicating with a central controller are omitted.

Col. 8, ll. 6–19. Rather than specifically defining or describing the communication aspects of the invention, the written description simply references communicating using "a known manner" and "well known steps."

Amazon argues that because the claim language requires the terminal device to be "connectable" to the central controller, the Internet, being a "connectionless" medium, is not covered by the claim. This argument fails for at least two reasons. First, Amazon applies the language "connectable" out of context. A reading of the claim as a whole reveals that "connectable" does not modify "communications network" so as to limit the claim to only connection-oriented communications. Rather, the claim simply provides that the terminal device be "selectively connectable" to the central controller. Nowhere in the claim language, the written descrip-

tion, or the prosecution history does the patentee discuss the difference between connection-oriented and connectionless in the context of the claimed communications network.

Second, the Internet is only connectionless in the sense that it is packet switched rather than circuit switched. Simply because the Internet is a packet switched network does not mean that it is incapable of establishing connections. When devices communicate using the Internet, logical connections are established between those devices. A reference in a claim to "connectable" devices, without any suggestion or context in the intrinsic evidence that would disclaim packet switched networks, does not by itself exclude communication over the Internet. Moreover, a person of ordinary skill in the art would consider the Internet to be a "communications network."[2]

For all of these reasons, the Court construes the term "communications network" as follows:

> Any network, including the Internet, enabling communication between a terminal device and a central controller.

## Claim Construction: "Transaction Type" and "Transaction Parameters"

■ As discussed above, claim 1 requires that all financial transactions include both a transaction type and a plurality of transaction parameters. Amazon argues that "transaction type" should be

---

**2.** Indeed, Amazon's own flagship U.S. Patent No. 5,960,411 discloses "communications link[s]" as incorporating "transmission[s] over the Internet." '411 Col. 6, ll. 19–21. Similarly, Amazon's invalidity expert, Dr. Kreitzberg, has asserted U.S. Patent No. 5,664,110 to Green, *et al.*, as prior art to the '055 patent. Dr. Kreitzberg notes that
> The DPU and DFTC in Green can communicate via telephone, cable, satellite, or fi-

ber-optic data transmission. (4:61–5:6). Green also teaches using "known communication means" such as telephonic serial data transfer or the Internet. (5:7–21)

Kreitzberg May 10, 2004, report at p. 33. The Court notes such extrinsic evidence not to support its claim construction, but rather to highlight the inconsistencies in Amazon's own arguments regarding the nature of "communications network."

defined as "an account balance inquiry or kind or type of asset transfer that is selected as part of a financial transaction," and that "transaction parameter" should be defined as "information necessary to define a given financial transaction." IPXL advocates for a broader definition of these terms. Specifically, IPXL contends that "transaction type" means any type of financial transaction and that "transaction parameter" means any parameter related to a financial transaction.

The specification in the '055 does not provide express definitions of these terms; however, it does provide relevant examples of each:

> ... selecting a type of transaction or function (withdrawal, deposit, transfer, payment, balance inquiry, etc.)

Col. 1, ll. 31–33

> ... transaction parameter (e.g., the amount to be withdrawn).... selecting one or more transaction parameter (e.g., accounts, dollar amounts, etc.) ....

Col. 1, ll. 59; Col. 5, ll. 53–54.[3]

Although a proper construction of "transaction type" and "transaction parameter" must encompass the examples set forth in the specification, the Court recognizes that the Federal Circuit has cautioned against limiting the claimed invention to the specific examples cited in the specification. *See e.g. Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed.Cir.1986).

Accordingly, the Court has looked beyond the specific examples and has carefully considered both the language used in the claims and the context of the entire patent. In defining these claim terms, the Court will apply the definition of "transaction" that it has already found in its construction of the terms "transaction types" and "transaction parameters." Second, the Court will incorporate the enumerated examples listed in the specification into its construction. Given this carefully prescribed context of these claim terms, the Court will again use dictionary definitions to confirm and support the ordinary meaning of "transaction type" and "transaction parameter." The following dictionary definitions are instructive:

> type: ... d: a particular kind, class, or group.

> parameter ... 2: any of a set of physical properties whose values determine the characteristics or behavior of something.

*Merriam–Webster's Collegiate Dictionary* (Tenth Edition, 1996) 843, 1278. Using these ordinary meanings to define the claim terms at issue, in light of the context of the patent, and encompassing the examples set forth in the specification, the Court construes the term "transaction type" as follows:

> A particular kind, class, or group of electronic transfer[s] of funds or a particular kind, class, or group of electronic inquiry[ies] as to funds. Examples of transaction types include withdrawals, deposits, transfers, payments, and balance inquiries.

The Court construes the term "transaction parameter" as follows:

> A property whose value determines the characteristics of (1) an electronic transfer of funds, or (2) an electronic inquiry

---

**3.** These sets of examples are consistent with the sparse discussion of "transaction type" in the prosecution history. "For example, one screen may seek selection of the transaction type, the next screen may ask for the user to select an account, another may ask for the amount of the transaction, etc." (IPXL 89) This sole reference to "transaction type" in the prosecution history merely supports the proposition that "accounts" and "amounts" are not transaction types.

as to funds. Examples of transaction parameters include the identification of the specific account, and the specific dollar amount.

**Claim Construction: "Means for Storing User Defined Transaction Information"**

 Both parties, as well as the Court, agree that claim 1's "means for storing user defined transaction information" is expressed as a means for performing a specified function pursuant to 35 U.S.C. § 112(6). As such, construction of this element is a two-part process involving first, the definition of the particular function and second, the identification of the corresponding structure for performing the function. *Golight, Inc. v. Wal–Mart Stores, Inc.*, 355 F.3d 1327, 1333 (Fed.Cir. 2004).

**Function**

The parties disagree over aspects of the function as well as the structure corresponding to the function. With regard to the function, both parties acknowledge that the claim element's function is expressly set forth in the claim as "storing user defined transaction information." Moreover, the claim defines "transaction information" as comprising "at least one of user defined transactions and user defined transaction parameters."

The elements comprising "transaction information" have already been construed. Accordingly, the Court concludes that a "user defined transaction" means:

a user defined electronic transfer of funds, or a user defined electronic inquiry as to funds, using an electronic funds transfer ("EFT") system such as an ATM system or a point of sale ("POS") system. Such electronic transfer of funds or electronic inquiry as to funds being characterized by both a transac-

tion type and a plurality of transaction parameters.

Similarly, a "user defined transaction parameter" means:

a user defined property whose value determines the characteristics of (1) an electronic transfer of funds, or (2) an electronic inquiry as to funds.

The parties dispute whether "user defined transaction information" requires both a "user defined transaction" *and* a "user defined transaction parameter" as Amazon contends, or only one of either a "user defined transaction" *or* a "user defined transaction parameter," as IPXL contends. For the reasons set forth below, the Court finds that IPXL misreads both the plain words used in the claim as well as Federal Circuit precedent in arguing for its interpretation. In construing the very same language, the Federal Circuit construed "at least one of" to mean what Amazon has argued.

The phrase "at least one of" precedes a series of categories of criteria, and the patentee used the term "and" to separate the categories of criteria, which connotes a conjunctive list. A common treatise on grammar teaches that "an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term." William Strunk, Jr. & E.B. White, *The Elements of Style* 27 (4th ed. 2000).... Applying this grammatical principle here, the phrase "at least one of" modifies each member of the list, i.e., each category in the list. Therefore, the district court correctly interpreted this phrase as requiring that the user select at least one value for each category....

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 886 (Fed.Cir.2004). As such, the Court rejects IPXL's position

and concludes that the function of "means for storing user defined transaction information" involves

> storing at least one user defined transaction (consisting of both a transaction type and a plurality of transaction parameters) *and* storing at least one additional user defined transaction parameter.

**Structure**

> The next step in construing a means-plus-function claim limitation is to look to the specification and identify the corresponding structure for that function. "Under this second step, 'structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed.Cir.2003)(quoting *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed.Cir.1997)).

*Golight* at 1334. Amazon advocates for a definition that limits the corresponding structure to only an ID card, whereas IPXL contends that the corresponding structure may include an ID card, local memory, and central memory. The Court agrees with IPXL's identification of corresponding structure.

The '055 specification expressly discloses the structures of (1) an ID card, (2) local memory and (3) central memory and clearly links these structures to the function of "storing transaction information." For example, the specification provides:

> The user-defined transactions may be stored on the ID card upon activation, added by a user at a terminal or auto-

matically stored based on the user's recent transactions. Alternatively, these transactions may be stored on the EFT system (for example in a memory associated with a local controller of one or more terminals or in a central memory associated with one or more central controllers) and recalled at the time a user desires to effect a transaction.

Col. 3, ll. 59–67.

> Consistent with the foregoing, instead of or in addition to storing user-defined transaction information on the ID card, such information may be stored in the local memory of one or more terminals or in a central memory or memories of the system.

Col. 10, ll. 16–20.[4] As such, the structure corresponding to the function of "means for storing user defined transaction information" is:

> An ID card, local memory, or central memory, and their equivalents.

**Claim Construction: "Single Screen"**

 The parties vigorously dispute the meaning of claim 1's "single screen" limitation. Both parties recognize that this limitation is emphasized in both the specification and the prosecution history as a defining feature of the '055 invention. Indeed, in distinguishing the '055 invention from the prior art during prosecution, the "single screen" limitation was repeatedly cited and characterized by the patentee.

The parties dispute, however, both the type of information that must be displayed on the "single screen" and the nature of the "single screen" in relation to the system as a whole. With respect to the information displayed on the single screen, Am-

4. Additional disclosure of an ID card as structure corresponding to the "means for storing" can be found at Col. 4, ll. 1–7; Col. 3, ll. 48–54; Col. 14, ll. 16–26. Likewise, additional disclosure of local and central memory as structure corresponding to the "means for storing" can be found at Col. 12, ll. 17–19, 22–24; Col. 14, ll. 16–26.

azon contends that the claim requires the presentation of a transaction type, a plurality of transaction parameters, and an additional transaction parameter. IPXL contends that only a transaction type and a plurality of transaction parameters must be displayed on the "single screen."

With regard to the nature of the screen and how it fits into the claimed system, Amazon contends that the "single screen" limitation does not preclude previous screens entirely, but that the limitation precludes the display of information entered by users on previous screens. IPXL contends that the "single screen" is the system's only screen and that the user must be able to specify the desired transaction or transaction parameters without first navigating a series of transaction entry screens. For the following reasons, the Court adopts neither party's position.

The complete limitation at issue incorporates already construed claim limitations. Specifically, "the processor causing the display to display on a single screen stored transaction information," incorporates the "transaction information" limitation (at least one user defined transaction and at least one user defined transaction parameter) already construed in conjunction with the "means for storing user defined transaction information" limitation. As such, no further construction is required to determine the nature of the information that is displayed on the "single screen."

A question remains, however, as to whether the claim requires the "single screen" to be the only screen presented to the user, or alternatively, whether other screens may precede the "single screen." Nothing in the language of claim 1 suggests that the "single screen" must be the only screen presented to the user. To the contrary, claim 1's preamble dictates that the claim covers a "system" which, as described in the specification, may present multiple screens to the user. For instance, the specification clearly describes a system that first identifies and verifies a user. Col. 6, ll. 65–66. Likewise, in disclosing the preferred embodiment, the specification contemplates preliminary steps that would require preliminary screens:

> Therefore, upon insertion of the ID card 30 into the reader/writer 13, information stored on the ID card 30 is read (other preliminary steps may also be performed in a known manner, such as entering a PIN, etc.) and a number of menu choices are displayed on the display 15.

Col. 7, ll. 20–24. Furthermore, the specification's flowcharts detail the flow of actions and operations associated with the system. The flow charts support the Court's conclusion that preliminary screens disclosing preliminary "start" and/or "identify user" boxes are encompassed within claim 1. Figs. 2, 5, 6. Although the system of claim 1 is not limited to a single and only screen, the specification and the prosecution history make clear that transaction information is to be entered exclusively on the "single screen" and may not be entered on preliminary or additional screens. In other words, as stated in the plaintiff's claim construction brief:

> The '055 specification and prosecution history clearly demonstrate that the only reasonable construction of "single screen" is a screen presented to the user, which the user uses to specify the desired transaction for execution or to specify one or more transaction parameters without first navigating a series of transaction entry screens.
>
> . . . . .
>
> From Amazon's claims charts, it appears that Amazon will argue that "single screen" may be a summary screen where transaction information is pre-

sented to the user after the user has proceeded through a series of consecutive screens to select a transaction type and/or transaction parameters. This, however, frustrates the very purpose of the '055 invention, which was to *avoid* the series of consecutive screens (which the specification calls "annoying," "time consuming," and "inefficient").

(IPXL Cl. Constr. Br. at 19, 21). The Court adopts plaintiff's argument that the "single screen" must exclusively display, and allow the user to modify, stored transaction information. That conclusion is clearly supported by the patentee's comments during the prosecution of the '055 patent. For instance, in response to the examiner's May 16, 1997, office action setting forth an objection to the specification and a rejection under 35 U.S.C. § 112(1), the patentee explained:

> ... one aspect of the present invention involves using a single display screen for selection of an ATM transaction. Currently known systems typically require a user to go through a series of screens and make a single selection per screen. For example, one screen may seek selection of the transaction type, the next screen may ask for the user to select an account, another may ask for the amount of the transaction, etc. None of the prior art of record appears to disclose providing a single screen for multiple selections.

(IPXL 00089). Again, in distinguishing prior art references following the examiner's January 6, 1999, office action setting forth an *obviousness* rejection under 35 U.S.C. § 103, the patentee explained:

> For example, with respect to ATM machines, a user typically must enter transaction information by selecting one transaction parameter per screen. Madan, even if it were to be considered analogous, does not disclose this.

> Neither Madan nor Martino discloses an ATM that enables a user to select from a single screen transaction type and transaction parameters.

(IPXL 00105–106). Consistent with these remarks, in a supplemental response to the examiner's January 6, 1999, office action, the patentee reiterated the nature of the "single screen" limitation when distinguishing additional prior art references:

> Neither Anderson or Coutts disclose at least displaying transaction information on a single screen as claimed by Applicant. Anderson and Coutts do not appear to relate to the various novel aspects of the present invention including those pertaining to presenting transaction information on a single screen.

(IPXL 00110). These remarks during the prosecution of the patent confirm that regardless of the nature of the preliminary screens involved in the system, a single screen must eventually present exclusive stored transaction information that may be selected exclusively on the "single screen."

The specification of the '055 also supports such an interpretation of the "single screen" limitation. For example, the specification explains that:

> The need to manually enter or select the transaction type and each or many of the transaction parameters each time a user desires to perform a transaction can be annoying and time consuming.

Col. 2, ll. 4–7.

> It is another object of the invention to provide an ATM system with a single display screen from which a user can select a transaction type and one or more of the transaction parameters necessary to define the selected transaction.

Col. 3, ll. 1–4.

> Unlike conventional ATMs, which use a series of consecutive menu screens to enable the user to select the transaction

type and transaction parameters, the GUI according to one embodiment of the present invention provides a single screen from which the user can select the transaction type and all or some of the transaction parameters necessary (or desired) to define the selected transaction.

Col. 14, ll. 29–36. Read in light of claim 1 as a whole, the '055 specification, and the '055 prosecution history, the Court concludes that "the processor causing the display to display on a single screen stored transaction information" requires:

> The presentation of stored transaction information to a user on one screen, without the user having to first encounter any preliminary screens that would require the user to select a transaction type or a transaction parameter.

**Summary Judgment of Non-infringement**

▆▆▆▆▆ Having construed the disputed claims of the '055 patent, the Court now addresses the questions of infringement and invalidity based upon anticipation.

> An infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims asserted, *see Markman II [v. Westview Instruments]*, 517 U.S. [370] at 371–73, 116 S.Ct. [1384] at 1387–88[, 134 L.Ed.2d 577 (1996)], and then the properly construed claims are compared to the allegedly infringing device, *see Read Corp. [v. Portec, Inc.]*, 970 F.2d [816] at 821, 23 USPQ2d [1426] at 1431 [(Fed. Cir.1992)].

*Cybor Corp. v. FAS Tech.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (*en banc*). A finding

of infringement for any particular claim requires that each and every limitation of that claim be found in the accused product. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345–46, 1357 (Fed.Cir. 2002). Similarly, a finding of invalidity under a theory of anticipation for any particular claim requires that each and every limitation of that claim be found in a single prior art reference. *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed.Cir.2003).

In the context of this summary judgment proceeding, Amazon bears the burden of showing that there are no genuine issues as to any material fact and that it is entitled to judgment as a matter of law. The Court is required to view the evidence in the light most favorable to IPXL and to draw all reasonable inferences in IPXL's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Summary Judgment: "Electronic Financial Transaction"**

▆▆▆▆ The primary summary judgment dispute between the parties centers on the nature of Amazon's 1–Click feature. IPXL claims that the 1–Click feature constitutes an electronic financial transaction. Amazon counters that its 1–Click feature is not an electronic fund transfer system or an electronic fund transaction system but rather a feature of an electronic product ordering system.[5] The Court finds that Amazon's characterization is correct.

Amazon is an Internet-based supplier of various consumer goods. To make purchases from Amazon's website, a user must establish an account. In setting up

5. These disputes do not involve genuine issues of material fact. Although IPXL's brief purports to contest many of the facts that Amazon sets forth in its brief regarding the nature of the Amazon 1–Click feature, IPXL's position are based on interpretations of the language of the '055 patent, and not on genuine factual disputes as to the operation of Amazon's 1–Click feature.

an account, the user provides information such as a name, an email address, a birthday, and a password. To use the 1–Click feature, a customer must particularly set the account up for 1–Click ordering. The advantage of this feature is that it streamlines the purchase process by keeping a record not only of the information needed to arrange for payment, but also of the name and address of the recipient of the purchase. It is therefore a feature aimed at repeat customers of Amazon who frequently ship goods to the same address. The advantage of the feature is its elimination of having to re-enter the same information—such as a shipping address, a phone number, and a credit card number—for each purchase. Amazon's system saves this information so that it is available each time the user visits Amazon's website and accesses her Amazon account.

To place an order for goods using Amazon's 1–Click feature, a user first visits Amazon's welcome page located at *www.amazon.com.* Unless the specific product sought appears on Amazon's welcome page, the user searches or navigates through additional Amazon web pages to locate a product. After searching or navigating, the user will arrive at a product detail page for the product sought. This page will contain information about the specific product and will have an option to "buy now with 1–Click." By choosing the "buy now with 1–Click" option from this product detail page, the user initiates the product ordering and shipping process. If the consumer planned to ship the product to a new address, such as sending a one-time present to a friend, she could not use the 1–Click feature.

The customer's 1–Click order is placed in a holding state for 90 minutes. During this period, the customer can review, modify or cancel the order. If the order is not cancelled, the order will be finalized and

shipped to the specific address registered for the 1–Click feature. It is only at this stage that Amazon initiates a separate process for obtaining payment for the customer's order.

There is no genuine factual dispute as to how payment is made. Amazon does not itself process and settle the payments for the goods it has shipped; rather its role is limited to collecting and forwarding the credit card and order information on to third-party payment processors in batches. These payment processors act as acquiring banks and settle the payment with the credit card associations. The payment processors then remit the funds, less applicable fees, to one of Amazon's depository banks.

For purposes of summary judgment, Amazon contends that its 1–Click feature is not an "electronic financial transaction" system because it does not transfer funds. Amazon emphasizes that its 1–Click feature is simply a streamlined method for placing orders for goods and directing to whom they should be shipped. IPXL contends that Amazon's 1–Click feature is an "electronic financial transaction system" because it allows for the purchase of goods over the Internet. The arguments are largely based upon the parties' respective claim construction positions, and just as the Court has found that most of Amazon's claim construction positions are meritorious, the Court also finds Amazon's summary judgment position meritorious.

The Court concludes that Amazon's accused 1–Click feature does not meet claim 1's "electronic financial transaction" limitation. Specifically, Amazon's 1–Click feature is not a system for the electronic transfer of funds or the electronic inquiry as to funds. Rather, it is a streamlined method for electronically ordering goods and arranging for their shipment. Amazon's 1–Click feature is analogous to a

standing charge account with a standing shipping address registered with a mail-order company. Contrary to IPXL's view, the 1–Click feature is not analogous to an ATM system, or any other embodiment falling within claim 1.

Although "paying for the purchase of goods" if done electronically is certainly an example of an "electronic financial transaction," Amazon's 1–Click feature is not a system for paying for the purchase of goods. Ordering goods for purchase and shipping is distinct from paying for those goods. Specifically, after a user selects goods for purchase using Amazon's 1–Click feature, a number of follow-on processes and systems are implicated before any type of fund transfer or financial transaction occurs. For instance, only if Amazon finalizes the order and ships the goods will Amazon then send a credit card settlement request to a third-party with whom Amazon has contracted to process credit card payments. (O'Mahony Report at 5–6). Although Amazon's 1–Click feature may eventually result in an electronic transfer of funds, the 1–Click feature itself does not execute any electronic transfer of funds. As such, Amazon's 1–Click feature does not meet the "electronic financial transaction" limitation of claim 1. This finding is sufficient to grant summary judgment to the defendant. However, in the interest of completeness the Court will address several other limitations which are also not met by the 1–Click feature.

**Summary Judgment: "Stored Transaction Information"**

 As noted above "stored transaction information" requires at least one user defined transaction (consisting of both a transaction type and a plurality of transaction parameters) and at least one addition-al user defined transaction parameter. Amazon's 1–Click feature, even if it were a financial transaction system, only allows for one "transaction type": paying for goods.[6] Amazon's system does not involve withdrawals, deposits, transfers, balance inquiries or any other particular kind, class or group of electronic funds transfer.

Similarly, Amazon's 1–Click feature only allows for two "transaction parameters": a user's credit card number and the identification of products, including Amazon's (not the user's) price for the products. The feature does not involve any other property whose value would determine the characteristics of an electronic transfer of funds.

Thus, even if Amazon's 1–Click feature did store one possible transaction type and two possible transaction parameters, such stored information would still fail to meet the "stored transaction information" limitation, as that limitation requires storage of (1) a transaction type, (2) a plurality of transaction parameters and (3) an additional transaction parameter.

**Summary Judgment: "Single Screen"**

 Even assuming that the 1–Click feature were a financial transaction system, and assuming that it allowed for the selection of a transaction type, a plurality of transaction parameters, and an additional transaction parameter, Amazon's 1–Click feature does not present

> stored transaction information to a user on one screen, without the user having to first encounter any preliminary screens that would require the user to select a transaction type or a transaction parameter.

**6.** Such a hypothetical situation requires stretching the 1–Click feature's true functionality, placing orders, into actually paying for those orders with an electronic transfer of funds.

To execute a 1–Click transaction, a user must navigate through a series of preliminary screens, select transactions and/or transaction parameters on those preliminary screens, and finally, execute the transaction from a screen that redisplays the already selected transaction information along with additional information.

In its summary judgment briefing, plaintiff offers no example where the 1–Click feature meets the single screen limitation. Instead, plaintiff simply cites its expert report in support of its argument that the 1–Click feature includes a single screen. The infringement examples offered by the plaintiff's expert, however, fail to meet the "single screen" limitation.

In his expert report, Dr. Felten indicates that:

> This claim element [single screen] appears several times in my [infringement] example interaction, for example, in conjunction with the web pages depicted in Appendices 14, 15, 16, 20, 21, 22, and 23. In each of these cases a stored transaction (which is a type of stored transaction information) is displayed to the user. When I viewed each of these pages, the processor (in my computer) caused my computer's display to display a screen containing the page.

(Felten Report at para. 73). The cited appendices refer to screen shots taken by Dr. Felten while performing his infringement analysis. Even assuming that these screens contain stored transaction information, a detailed review of Dr. Felten's activities reveals (1) that Dr. Felten first had to navigate through a series of transaction entry screens and (2) that each cited screen shot contains transaction information that Dr. Felten had selected on a previous screen.

For instance, before arriving . at the screen shown at appendix 14, Dr. Felten first navigated to the Amazon welcome page (appendix 12), performed a search using information describing the type of product in which he was interested, navigated to a results page (appendix 13), selected a link for a specific product listed on that results page, and finally, arrived at a product summary page (appendix 14). The product summary page is not a "single screen" for at least the reason that it contains transaction information, including the identification of a product and the price of the product, which was clearly selected by Dr. Felten from a previous screen (the results pages at appendix 13) and which arguably was selected by Dr. Felten during his search on Amazon's welcome page (appendix 12).

From the product summary page, Dr. Felten clicked the "Buy now with 1–Click" button, which took him to a thank you page (appendix 15). The thank you page is not a "single screen," as it contains transaction information, including the identification of the product, which was clearly selected from a previous screen.

From the thank you page, Dr. Felten clicked the "Buy now with 1–Click" button for another product listed on the thank you page under the heading "Other items you might enjoy." [7] Dr. Felten was direct-

---

7. The "recommendations" or "other items you might enjoy" categories of products encountered when using Amazon's 1–Click feature are the closest Amazon comes to meeting the "single screen" limitation. These types of screens, however, do not meet the single screen limitation for several reasons. The examples presented to the Court establish that the user does not encounter these "recommendations" screens until after the user has already ordered another product. As such, the user must first navigate through a series of transaction entry screens. The transaction information for the ordered product, which was entered and selected on previous screens,

ed to another thank you page (appendix 16). This thank you page is likewise not a "single screen" as it contains transaction information selected from the previous thank you page (appendix 15).

Dr. Felten revisited the Amazon home page (appendix 18) and performed a search using information describing the type of product in which he was interested. Again, Dr. Felten was taken to a search results page (appendix 19). Dr. Felten selected a specific product from the list of products on the results page and was taken to a product summary page (appendix 20). The product summary page at appendix 20 is not a "single screen" for the same reasons discussed above with respect to the product summary page at appendix 14. This time, Dr. Felten clicked the "Add to Shopping Cart" button, which took him to a another page that illustrates the item added to the shopping cart along with a list of additional items in which the customer might be interested (appendix 21). This page is not a "single screen" for at least the reason that it contains transaction information, including the identification of a product, which was clearly selected by Dr. Felten from a previous screen (the results pages at appendix 19) and which arguably was selected by Dr. Felten during his search on Amazon's welcome page (appendix 18).[8]

Dr. Felten next clicked the "Add to cart" button for one of the items listed as recommendations on the page at appendix 21. This action took Dr. Felten to another page, which lists the contents of Dr. Felten's shopping cart and contains a list of additional items in which the customer might be interested (appendix 22). This page is not a "single screen" for at least the reason that it contains transaction information, including the identification of two products, which clearly was selected by Dr. Felten from a previous screen.

Finally, Dr. Felten clicked the "View Cart" button on the screen at appendix 22, which took him to a shopping cart page (appendix 23). This page is not a "single screen," as it contains transaction information, including the identification of products and the prices of those products, which was selected by Dr. Felten on previous screens. As such, none of the appendices cited by Dr. Felten (14, 15, 16, 20, 21, 22 and 23) meet the "single screen" limitation.

As the discussion above establishes, the plaintiff has not identified a single example of a user confronting claim 1's "single screen" limitation while using the defendant's 1-Click feature. All of the plaintiff's examples require the user to encounter multiple screens on which the user must select transaction types and/or a transaction parameter. This failure to sat-

---

remains on the "recommendations" screen for display and modification.

Amazon's expert recognizes that sometimes these "recommendations" will be presented to the user on Amazon's first, welcome screen: "Unless the item appears on the welcome page for that user, the user must normally navigate through more than one web page to find the item." (O'Mahony Report at 18). Even where items are displayed for selection with 1-Click on Amazon's first welcome screen, the screen is not a "single screen," because it does not display "stored transaction information." First, as noted

above, the screen lacks the required third transaction parameter. Second, the recommended items are not "user defined transaction parameters." Specifically, Amazon's system does not allow the user to define such items, but rather displays the items based on Amazon's analysis of the collective buying habits of all of its customers. (O'Mahony Report at 22).

8. "Items placed in a shopping cart are not stored for repeated future use, but are simply a step in the process of placing an order for a particular item." (O'Mahony Report at 16).

isfy the "single screen" limitation further supports the conclusion that the '055 patent is not infringed by the defendant's 1–Click feature.

**Summary of Amazon's Noninfringement**

Having construed the key claims of the '055, and drawing all reasonable inferences in favor of the non-movant, the Court concludes that no reasonable jury could find defendant's 1–Click product ordering feature to infringe plaintiff's patent. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 540 (Fed.Cir.1998). Amazon's 1–Click feature is not a "financial transaction" system, does not contain "stored transaction information" and does not use a "single screen." Claim 1 requires all of these elements, and as such, Amazon's 1–Click feature does not infringe claim 1 of the '055 patent.

■■■ Moreover, claim 1 is the only independent claim in the '055 patent. As such, all claims of the '055 patent, including asserted claims 2, 9, 15 and 25 incorporate by reference the limitations of claim 1. *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 189 F.3d 1370, 1376 (Fed. Cir.1999); 35 U.S.C. § 112. Because Amazon's 1–Click feature does not contain all of the limitations of claim 1, it cannot contain all of the limitations of dependent claims 2, 9, 15 and 25. Accordingly, the defendant will be granted summary judgment as to the plaintiff's allegation of patent infringement.

**Summary Judgment of Invalidity**

Lastly, the Court considers defendant's motion for summary judgment as to the invalidity of the '055 patent. Defendant asserted three patents as invalidating prior art under 35 U.S.C. § 102: Coutts's United States Patent No. 5,389,773 ("Coutts"), Tarbox's United States Patent No. 5,705,798 ("Tarbox"), and Kelly's United States Patent No. 4,449,186 ("Kelly"). For the reasons discussed below, the Court does not find Tarbox or Kelly to be invalidating prior art but does find that Coutts anticipates claims 1, 2, 9 and 15 of the '055 patent under § 102(a).[9] Furthermore, the Court finds claim 25 invalid for indefiniteness under 35 U.S.C. § 112(2).

**Legal Principals of Invalidity by § 102 Anticipation**

■■■ A patent issued by the United States Patent and Trademark Office is presumed valid under 35 U.S.C. § 282. As such, a party may overcome that presumption only by establishing that the patent is invalid by "clear and convincing" evidence. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985). The burden of proving invalidity based upon prior art does not change if that same prior art was specifically examined by the examiner during prosecution of the patent. *Abbott Labs. v. Syntron Bioresearch Inc.*, 334 F.3d 1343, 1357 (Fed.Cir.2003). Anticipation is a question of fact, *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.1984), and as noted above, "[a] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed.Cir.2001). A finding of anticipation by summary judgment "is improper if a reasonable jury could find that" not every claim limitation of the patent-in-suit is found in the prior art. *Abbott Labs. v.*

---

9. The '055 patent application was a continuation-in-part of U.S. Patent Application No. 08/421, 486, filed April 13, 1995, entitled "Electronic Fund Transfer System," now issued as U.S. Pat. No. 5,546,523. Because Coutts issued on February 14, 1995, it is potentially prior art under § 102(a).

*Torpharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir.2002).

## Tarbox and Kelly Do Not Anticipate

■ Tarbox, entitled "System and Method for Processing a Customized Financial Transaction Card," does not anticipate the '055 patent because it fails to teach "an input mechanism enabling a user to use the displayed transaction information . . . to enter selections to specify one or more transaction parameters" as required by claim 1. Tarbox, like Coutts, is directed towards an ATM system that presents users with customized menus designed to facilitate and expedite financial transactions. In relevant part, Tarbox teaches a customized menu screen containing, among other transaction options, a "Quick Cash" key. Fig. 5 (Quick Cash key 505). The "Quick Cash" key is a shortcut that allows users to withdraw cash in an amount that may be predefined by the user. Col. 6, ll. 25–43. Amazon argues that Tarbox anticipates the '055 in that several of these "Quick Cash" keys may be programmed to appear on a single customized menu display. Amazon further argues that by selecting "Quick Cash $20" over "Quick Cash $40," the user has entered a selection to specify the transaction parameter of $20 rather than $40. Amazon SJ Br. at 33; Amazon SJ Reply at 18–19. IPXL argues that Amazon's argument fails because Tarbox does not teach the ability to program *multiple* "Quick Cash" keys. Rather, it teaches only one such key. Fig. 5 (displaying a *single* Quick Cash key 505); Col. 6, ll. 28–29 ("*the* 'Quick Cash' key which will retrieve a predetermined amount")(emphasis added); Col. 6, ll. 37–38 ("*the* 'Quick Cash' function can be set to any desired level")(emphasis added); Col. 6, ll. 41–43 ("the user's desired 'Quick Cash' function is $75 as reflected [in Fig. 5] by the function block 505"). The Court finds IPXL's argument

valid, and thereby rejects Tarbox as anticipating the '055

■ Kelly fails as prior art for similar reasons. The Kelly patent is entitled "Touch Panel Passenger Self–Ticketing System" and is directed towards "[a]n automated system for vending airline tickets to credit card purchasers based upon reservation data stored in a central host computer, without the intervention of any ticket agents." Abstract. In one embodiment, a user inserts a credit card into the credit card reader 33 of the ticket terminal 10, Fig. 1, and is presented with a screen asking the user to enter a flight reservation number, Fig. 4. After doing so, the user is presented with another screen, Fig. 5's screen 64. Amazon argues that this "single screen" enables a user to "execute a financial transaction." Amazon SJ Br. at 33–34; Amazon SJ Reply at 19–20. Assuming, arguendo, that ordering a ticket constitutes the execution of a financial transaction, screen 64 does not also "enabl[e] a user . . . to enter selections to specify one or more transaction parameters," as required by claim 1. Without going to additional screens, a user cannot specify a particular seat on the airplane or any other parameters of the purchase of his ticket. *See* Fig. 6 (flow diagram teaching that an additional screen is required before a user may specify a seat on the airplane). For failing to teach the single screen limitation, as discussed above, and the "specify transaction parameter(s)" limitation, Kelly does not anticipate.

## Background of the Anticipatory Coutts Patent

During prosecution of the '055 patent, the examiner rejected the application in light of Coutts and Anderson (another patent not at issue here). In responding to the office action, the patentee distin-

guished his invention by stressing that Coutts did not disclose the single screen limitation.

> Applicant has reviewed Anderson and Coutts. These patents, alone or in combination, do not disclose or render obvious any of the claims of the present invention. Neither Anderson or Coutts disclose at least displaying transaction information on a single screen claimed by Applicant. Anderson and Coutts do not appear to relate to the various novel aspects of the present invention including those pertaining to presenting transaction information on a single screen. Additionally, there is no suggestion to combine these materials.

Thereafter, the claims of the '055 patent were allowed.

The Coutts patent, entitled "Self–Service System Having Transaction Predictive Capability and Method of Using," is directed towards an ATM system designed to enable its users to "complete a transaction with greater overall speed, and to simplify the decisions and selections which need to be made . . . ." Col. 3, ll. 35–37. The system accomplishes these goals in two primary ways: (1) by predicting and preparing the types of transactions the user is likely to desire while the user is still entering his personal identification number ("PIN") and (2) by presenting the user with a "simplified menu" of predicted transactions that allows the user to execute a transaction quickly with a limited number of inputs and/or screens. The abstract reads as follows:

> A self-service system, such as an automated teller machine (ATM) system, uses predictive technology. When a user begins a transaction by inserting an identification card into a card reader of an ATM, the predictive technology predicts which service or services provided by the system the user is likely to request. This prediction is based upon a stored record in the system, representing previous transactions by that user. The prediction is made in advance of completion of an authorization process for the transaction, to increase the speed of operation of the ATM in carrying out the transaction. For example, to reduce overall transaction time, the ATM can count out a predicted amount of cash in advance of an anticipated withdrawal request. Also, the prediction is used to generate a special display for a particular user, the display being designed to simplify the decisions and selections required to be made by the user.

In the Background of the Invention, Coutts teaches the need to reduce the number of screens or "menu interfaces" a user must navigate through in order to "access the actual service which the user requires," Col. 1, ll. 14–33. Clearly, Coutts stresses a similar, if not identical, goal of the '055 patent.

**Coutts Anticipates Claim 1**

 Claim 1 is fully anticipated by Coutts. For clarity, the Court has indicated separately and in bold each limitation of claim 1 as it reviews the Coutts patent.

**"An electronic financial transaction system for executing financial transactions, the transactions being characterized by a transaction type and a plurality of transaction parameters,"**

The Court has previously construed the term "electronic financial transaction" as:

> The electronic transfer of funds, or the electronic inquiry as to funds, using an electronic funds transfer ("EFT") system such as an ATM system or a point of sale ("POS") system. Such electronic transfer of funds, or electronic inquiry as to funds, being characterized by both

a transaction type and a plurality of transaction parameters.

Under this construction, Coutts anticipates because the invention is specifically directed towards "an automated teller machine (ATM) system...." Abstract. A user may use the Coutts ATM system to execute transactions that "a standard ATM allows [including] the withdrawal of a number of different cash amounts, the printing of mini-statements, the display or printing of a user's account balance, the requesting of a full statement to be sent to a user, and the making of a deposit." Col. 1, l. 67–Co. 2, l. 3.

The Court has also previously construed the terms "transaction type" and "transaction parameter." "Transaction type" has been construed as:

A particular kind, class, or group of electronic transfer[s] of funds or a particular kind, class, or group of electronic inquir[ies] as to funds. Examples of transaction types include withdrawals, deposits, transfers, payments, and balance inquiries.

"Transaction parameter" has been construed as:

A property whose value determines the characteristics of (1) an electronic transfer of funds, or (2) an electronic inquiry as to funds. Examples of transaction parameters include specific accounts and specific dollar amounts.

Under these constructions, most of the transactions that can be executed using the Coutts system are "characterized by both a transaction type and a plurality of transaction parameters." For example, "the withdrawal of a number of different cash amounts," Col. 1, l. 68, constitutes a transaction type (cash withdrawal) and a plurality of transaction parameters (the different cash amounts).

**"the system comprising: a central controller;"**

Coutts clearly teaches a "central controller" by referring to a "host computer 12." Col. 3, l. 17; Figs. 1 and 3.

**"a communications network;"**

The Court has previously construed the term "communications network" as:

Any network enabling communication between a terminal device and a central controller.

Under this construction, Coutts teaches a "communications network" by linking several ATMs to a central controller (the "plurality of ATMs 10[are] connected ... in [a] conventional manner to [the] host computer 12." Col. 2, ll. 54–55; Fig. 1.). Each individual ATM 10 is connected to the host computer 12 by a communications module 34. Col. 3, ll. 2–17 ("each ATM 10 include[s] ... a communications module 34 for coupling the ATM 10 to the host computer 12"); Figs. 1 and 2.

Finally, Coutts teaches that the terminal devices (ATMs 10) and central controller (host computer 12) communicate with each other and are therefore part of a communications network. Once a user initiates a transaction, the terminal device downloads data from the central controller to predict a user's likely transactions. Col. 4, ll. 6–15. After a user has completed a transaction, the terminal device uploads data to the central controller "so as to take account of the requested service or services," Col. 5, ll. 56–57.

**"a terminal device"**

Coutts teaches a "terminal device" in the system's "plurality of ATMs 10." Col. 2, ll. 53–56; Figs. 1 and 2.

**"selectively connectable to the central controller through the communications network,"**

Coutts teaches this limitation because each terminal device (ATM 10) of the sys-

tem is "coupled" to the central controller (host computer 12) through a communications module 34. Col. 3, ll. 15–17.

**"the terminal device comprising; a processor;"**

Coutts teaches that each ATM 10 includes a "processing means 32 for controlling the operations of the various elements of the ATM 10." Col. 3, ll. 14–15; Fig. 2.

**"a display connected to the processor;"**

Each "terminal device" (ATM 10) includes a "display," which Coutts labels, somewhat inconsistently, as a "lead-through display screen 18," *e.g.* Col. 2, l. 61; Col. 3, l. 42; Col. 6, l. 12; Fig. 2, a "lead-through display 18," Fig. 2, Claim 24, a "display screen 18," *e.g.* Col. 4, l. 18; Col. 4, l. 48, and a "screen 18," *e.g.* Col. 4, l. 53; Col. 4, l. 56; Col. 5, l. 12. For clarity, the Court will refer to this component exclusively as the "lead-through display screen 18." Coutts teaches that the lead-through display screen 18 is "connected" to the terminal device's "processor" (processing means 32) by having the two devices in communication with one another. Col. 3, ll. 40–43 ("the processor means 32 causes a particular menu to be displayed on the lead-through display screen 18").

**"an input mechanism for providing input to the processor;"**

Each ATM of the Coutts system includes a "key operated input means 16 for enabling a user ... to enter a personal identification number (PIN) and to select desired services provided by the ATM 10." Col. 2, l. 58.

**"the system further comprising means for storing user defined transaction information, the transaction information comprising at least one of user defined transactions and user defined transaction parameters;"**

The Court has previously concluded that the structure corresponding to the '055's claimed function of "storing user defined transaction information" includes:

"an ID card, local memory, or central memory and their equivalents."

Coutts teaches the same structure by identifying an "ID card," "central memory," or a "combination" of both for performing the function of storing user defined transaction information.

Each time that a user performs a transaction, the user behaviour and the final requirements can be recorded in some manner by the self-service system. This recorded information can then be used to construct a data base which characterizes that user's behaviour pattern with respect to the user's use of the terminals included in the system. This data base can be stored in the host computer of the system, in the user's card or in a combination thereof, as appropriate.

Col. 2, ll. 8–16.

More specifically, in the "central memory" embodiment, Coutts teaches that "[t]he host computer 12 includes a user reference file 36 which includes records of the types of transactions performed by users in previous uses of the system ...." Col. 3, ll. 18–20; Fig. 1. "In [the] alternative embodiment[,] ... instead of storing a user reference file in the host computer 12, a data base containing a record of a user's previous transactions could be stored in the identification card for that user ..." Col. 5, l. 68–Col. 6, l. 3.

**"the processor causing the display to display on a single screen stored transaction information;"**

The Court has previously construed "the processor causing the display to display on a single screen stored transaction information" as requiring:

The presentation of stored transaction information to a user on one screen,

without the user having to first encounter any preliminary screens that would require the user to select a transaction type or a transaction parameter.

As noted, the term "transaction information" is expressly defined in the '055 as "comprising at least one of user defined transactions and user defined transaction parameters." Col. 20, ll. 39–40.

Under the Court's interpretations of the claim terms, Coutts anticipates the '055 patent. Coutts teaches that "the processor means 32 causes a particular menu to be displayed on the lead-through display screen 18 following initiation of a transaction by a user and following a prediction that particular services are likely to be requested by the user." Col. 3, ll. 40–43. The menu displayed to the user on the lead-through display screen 18 can be, "[f]or example, a simplified menu ... consisting of only four questions, such as: 'Do you require $20?,' 'Do you require $30?,' 'Do you require a mini-statement?,' and 'Do you require some other transaction?' " Col. 3, ll. 45–49. The three customized options on the simplified menu constitute "stored transaction information." Coutts teaches this by describing the two cash withdrawal options ($20 cash withdrawal and $30 cash withdrawal) as "predicted" withdrawal requests, Col. 3, ll. 53–55, where such predictions are made by the prediction process 44 based on "data concerning the user's previous behaviour pattern," Col. 4, ll. 7–8. Thus, the processor 32 of Coutts clearly "caus[es] the display to display on a single screen stored transaction information" of the user as taught by the "simplified menu" example.

IPXL insists that the single screen limitation is not taught by Coutts. In support, IPXL seizes on the term "lead-through display" to argue that there is no "single screen" in Coutts because a user must first navigate through "lead-through display screens" before being allowed to execute a transaction.

Indeed, contrary to the teaching and claims of the '055, Coutts teaches the need to navigate through a "lead through display" to execute the transaction. Ex. 18 at 3:40–44. As the specification states: Thus the processing means 32 causes a particular menu to be displayed on the lead-through display screen *following* initiation of the transaction by the user ... *Id.* (emphasis added). Indeed, contrary to the requirements of Claim 1 of the '055 Patent, Coutts teaches utilization of a series of multiple screens in order to execute the transaction. The examiner, by allowing the claims over Coutts, apparently concluded the same.... In short ... in order to get what Amazon claims is the "single screen" disclosure of Coutts, a user must first choose a transaction and go through "lead-through display screens" even after insertion of the identification card. Ex. 18 at 3:30–45; Ex. I at 481, 486–87, 490–91; Ex. 25 at ¶ 62. IPXL SJ Opp. at 31–33.

IPXL's argument is unavailing and raises no genuine issue of material fact. The Coutts specification teaches that the "lead through display screen 18" refers to a *physical* screen (such as a glass or LCD screen) and *not the image* presented on a physical screen (such as a menu or welcome page screen). Although Coutts refers to the same component by four different names: "lead-through display screen," "lead-through display," "display screen" and "screen," all four terms obviously refer to the same component because, with the exception of claim 24, each is followed by the same reference number—18.[10] As

10. IPXL omits the reference number 18 when

citing the "lead-through display screen" of

shown in Fig. 2, the lead through display screen 18 is one of many *physical* components and systems that make up the ATM 10. It is not a screen in the sense of an image displayed to the user, such as the "simplified menu" discussed in Col. 3, ll. 45–57. Finally, the meaning of "lead-through display screen 18" is clear from the context of Col. 5, ll. 3–12. Here, Coutts discusses what happens when a user requests a mini-statement or account balance. He explains that the requested information can be "presented to the user . . . by way of a printed record prepared by the printer . . . or by way of a visual display **on the screen 18.**" Col. 5, ll. 10–12 (emphasis added).

Next, IPXL points out that the "simplified menu," from which a user may execute a transaction, only appears *"following* initiation of the transaction by the user." IPXL SJ Opp. at 31 (citing Coutts, Col. 3, ll. 42–43). Thus, IPXL argues, "contrary to the requirements of Claim 1 of the '055 Patent, Coutts teaches utilization of a series of multiple screens in order to execute the transaction." IPXL SJ Opp. at 31. Although a screen (not "a series of multiple screens" as IPXL states) appears before the simplified menu screen, the previous screen is not precluded by the Court's construction of the term "single screen."

In fact, Coutts teaches that the simplified menu screen appears *after* two steps occur: (1) "**initiation** of [the] transaction by the user" ("initiation step") and (2) the system's "**prediction** [of] particular services . . . likely to be requested by the user" ("prediction step"). Col. 3, ll. 40–43 (emphasis added). During the initiation step,

> a transaction is initiated by a user inserting his identification card (block 40) into the slot (not shown) forming part of

the card reader 20 of the ATM 10 being used by the user. A user authorization process (block 42) is then initiated by virtue of the user entering his PIN in the interface unit 14 using the input means 16.

Col. 3, ll. 62–68. Therefore, a PIN entry screen is the only screen that would appear before the simplified menu screen described in Col. 3, ll. 45–57. However, a PIN entry screen is allowed under the Court's construction of the "single screen" limitation.

The second and final step occurring before the appearance of the "simplified menu" screen is the prediction step (prediction process 44). However, the prediction step, which occurs "[i]n parallel with the user authorization process 42," Col. 4, ll. 1–2, is a process that is entirely internal to the system, requires no inputs from the user, and presents no additional screens to the user. Col. 4, ll. 1–18 (describing the prediction process); *See also* Fig. 3 (flow diagram demonstrating that the prediction process 44 is entirely internal to the system without any interaction with the user).

Therefore, the "simplified menu" example: " 'Do you require $20?,' 'Do you require $30?,' 'Do you require a mini-statement?,' and 'Do you require some other transaction?,' " Col. 3, ll. 45–49, constitutes a "single screen" displaying "stored transaction information," as required by claim 1. **"the input mechanism enabling a user to use the displayed transaction information to execute a financial transaction or to enter selections to specify one or more transaction parameters."**

Coutts clearly anticipates this limitation in its example of the "simplified menu . . . consisting of four [transaction options]: 'Do you require $20?,' 'Do you require $30?,' 'Do you require a mini-statement?,'

Coutts. IPXL SJ Opp. at 31–33.

and 'Do you require some other transaction?'" Col. 3, lines 45–49. As discussed above, the three customized transaction options presented on this "single screen" constitute stored, user defined transaction information.

Coutts expressly teaches an "input mechanism enabling a user to use the displayed transaction information to *execute* a financial transaction" as one of the claim limitations requires. "[U]sing the information ... displayed on the display screen 18 the user requests a particular service by means of the input means 16." Col. 4, ll. 46–49 (emphasis added). "If this particular service is already one of the options displayed on the screen 18," Col. 4, ll. 49–50, i.e., because the system has successfully predicted the user's desired transaction based on prior transactions, "the user simply actuates one or more of the keys of the input means 16, as indicated on the screen 18." Col. 4, ll. 52–53.

Coutts also explains the process of executing the same two different types of financial transactions, as does the '055, by providing for: (1) requests for a mini-statement or account balance [11] and (2) cash withdrawals.[12] Returning to the simplified menu example, if a user selects "Do you require a mini-statement?," such an electronic financial transaction will be "executed" (i.e., fully carried out) immediately, without the need for further inputs from the user or additional screens.

> Referring now ... to FIG. 4, if the service request is a request for a mini-statement or balance of account then a check is initially made (block 54) as to whether the required data has already been made available (block 48) as a result of the prediction process 44. If the required data is already available, then the requested statement or balance information is **immediately** prepared (block 56) and presented to the user (block 58) by way of a printed record prepared by the printer 24 or by way of a visual display on the screen 18.

Col. 5, ll. 2–12 (emphasis added).

If a user selects, for example, "Do you require $20?," such an electronic financial transaction will be executed (i.e., cash actually dispensed to the user) following one additional screen or prompt, which inquires "whether another service is required by the user." Col. 5, ll. 51–52; Fig. 3 (step 72). "If another service is not required," then-after some internal processing-the "already counted amount of cash is presented to the user (block 80) as the final stage in the transaction process." Col. 5, ll. 55–66.

Although the "Do you require a mini-statement?" example is sufficient to anticipate the "execute" requirement of the claim, the Court notes that the "Do you require $20?" and "Do you require $30?" examples also anticipate. Simply because a user must navigate through an "Another Service?" screen (Fig. 3, step 72) before cash is dispensed does not change the fact that selecting the "Do you require $20?" option, for example, has "enabled" the user to execute (i.e., fully carry out) that particular financial transaction. Moreover, the '055 patent itself, in a preferred embodiment, teaches an analogous final screen that appears after the user has selected a custom transaction *but before* the transaction is actually executed.[13]

---

**11.** Requests for a mini-statement or account balance are discussed in Col. 5, ll. 1–17 and the flow diagram of Fig. 4.

**12.** Cash withdrawals are discussed in Col. 5, ll. 18–48 and the flow diagram of Fig. 5.

**13.** "Also, it may be desirable after selection by the user of a custom transaction (step 107), and/or additional input (step 108) that the controller causes the transaction type and parameters to be displayed with a prompt for

In addition to allowing users to "execute" a transaction, claim 1 of the '055 requires that the input mechanism "enabl[e] a user to use the displayed transaction information ... *to enter selections to specify one or more transaction parameters.*" (emphasis added). Again, this limitation is taught in Coutts by the simplified menu example. By *selecting* "Do you require $20?" over "Do you require $30?," a user has "specified" a transaction parameter, namely, the dollar amount $20 as opposed to the dollar amount $30. IPXL opposes this conclusion by arguing that:

> In the simplified menu cited by Amazon as containing the four questions, the user would have to choose the "Do you require some other transaction" item in order to reach an additional screen on which to enter a transaction parameter. *See also* E. 18 at 4:53–58 ("If the service desired by the user is not one of the displayed options, then one or more alternative menus are displayed on the screen 18, in response to instructions entered by the user by the means of the input means 16, until the desired service is one of the options displayed."). In other words, unlike the requirement in the '055 Patent the user cannot specify a transaction parameter without additional screens. Stated another way, a user cannot "enter selections to specify one or more transaction parameters" from that claimed "single screen."

IPXL SJ Opp. at 33.

This arguments fails because, as discussed above, a user need not select "Do you require some other transaction?" to "specify" a parameter from the simplified menu screen. By selecting "Do you re-

quire $20?" over "Do you require $30?" (or vice versa), the user has "entered a selection" to "specify" a transaction parameter, namely, the dollar amount.

**Coutts Anticipates Claims 2, 9 and 15**

Dependent claims 2, 9 and 15 are also invalid as anticipated by Coutts.

**Claim 2: "The system of claim 1 wherein the system predicts transaction information that a user of the terminal will desire based on stored data for that user."**

Coutts teaches a system that predicts a user's desired transactions based on stored data for that user. The relevant part of the Abstract reads as follows:

> When a user begins a transaction by inserting an identification card into a card reader of an ATM, the predictive technology predicts which service or services provided by the system the user is likely to request. This prediction is based upon a stored record in the system, representing previous transactions by that user.

In more specific terms, Coutts explains that the system "predicts what service or services the user is likely to wish to use," Col. 4, lines 12–13, based on "data concerning the user's previous behaviour pattern derived from the user reference file 36 [stored on the host computer 12] ...." Col. 4, ll. 7–9.

**Claim 9: "The system of claim 1 further comprising means for identifying a user prior to enabling the user to execute a transaction."**

The Coutts patent anticipates because it explicitly teaches the use of an "identifica-

---

the user to verify that this is the desired transaction to be executed (step 109). If the transaction type and parameters are as desired, the user may verify this by one of the input techniques described herein or other input techniques. Preferably, the display pro-

duced in step 109 may also give the user options to cancel the transaction, edit the parameters thereof, reselect a transaction or other desired options." '055 patent, Col. 9, ll. 15–26; Fig. 2 (step 109).

tion card," along with a PIN, to identify and authorize a user to use the system. Col. 3, ll. 62–68.

### Claim 15: "The system of claim 9 wherein the system predicts transaction information that a user of the terminal will desire based on stored data for that user."

Claim 15 merely incorporates the limitations of claims 2 and 9. Therefore, for the same reasons that claims 2 and 9 are anticipated, claim 15 is also anticipated.

### Legal Principals of Invalidity by 35 U.S.C. § 112(2) Indefiniteness

 Under 35 U.S.C. § 112(2), a claim must "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." Furthermore, 35 U.S.C. § 101 defines the various classes of subject matter eligible for patenting. As interpreted by the courts, apparatuses (which includes "systems") and processes (or "methods") are both classes of patent eligible subject matter under 35 U.S.C. § 101 and may both be claimed in the same patent. This occurs, for example, in patents that claim both an apparatus and a method of using the apparatus. Such patents contain separate sets of claims directed towards the two different classes of invention. However, "combining two separate statutory classes of invention *in a single claim* ... is not sufficiently precise to provide competitors with an accurate determination of the 'metes and bounds' of protection involved." *Ex parte Lyell,* No. 89–0461, 1990 WL 354583, at *5 (Bd. Pat.App. & Inter. Aug. 16, 1990)(emphasis added). Consequently, an invention "which purports to be both an apparatus and a process *in a single claim,* is ambiguous and properly rejected" as indefinite under 35 U.S.C. § 112(2). *Id.* at *6 (emphasis added).

### Invalidity of Claim 25 by 35 U.S.C. § 112(2) Indefiniteness

Claim 25 reads as follows:

**The system of claim 2** wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, **and the user *uses* the input means** to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

(emphasis added).

The claim is invalid as indefinite because it attempts to claim both a system and a method of using that system.

### Summary of Invalidity

For the reasons discussed above, because the Coutts reference teaches all of the limitations set forth in claims 1, 2, 9 and 15 of the '055 patent, those claims are invalid under 35 U.S.C. § 102(a). Moreover, because claim 25 improperly claims both a system and a method, it is invalid under 35 U.S.C. § 112(2). Accordingly, Amazon's motion for summary judgment on the issue of invalidity will be granted. An appropriate order will issue with this memorandum opinion.